**CHRISTIAN KNIGHTS OF the KU KLUX KLAN INVISIBLE EMPIRE, INC., et al., Appellees,**

v.

**DISTRICT OF COLUMBIA, et al., Appellants,**

**United States of America, Appellee.**

**No. 91–5011.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1992.

Decided Aug. 14, 1992.

As Amended Aug. 14, 1992.

Rehearing and Rehearing En Banc Denied Oct. 20, 1992.

Donna M. Murasky, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellants.

Arthur B. Spitzer, with whom Elizabeth Symonds, Washington, D.C., was on the brief, for appellees, Christian Knights of Ku Klux Klan Invisible Empire, Inc., et al.

John C. Cleary, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, R. Craig Lawrence, and Michael L. Martinez, Asst. U.S. Attys., Washington, D.C., were on the brief, for federal appellee.

Before: BUCKLEY, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

On October 28, 1990, twenty-seven members of the Ku Klux Klan paraded from the Washington Monument down Constitution Avenue to Capitol Hill. A violent counter-demonstration had been threatened, causing the full mobilization of the Metropolitan Police Department and the commitment of more than 3,500 police officers. Disputes about the permit for the march generated two district court rulings, the second issuing twelve hours before the march, in the wake of this court's decision, on an emergency appeal, vacating and remanding the initial order.

District Judge Oberdorfer, on remand, issued an order in the form of a preliminary injunction requiring the District of Columbia to grant the Klan's request for a march permit. The District brings this appeal to challenge that order. The United States (a party to the proceedings because the Klan had requested, in the alternative, a permit to march along streets under federal control) urges us to dismiss the appeal as moot. The Klan asks us to affirm. Because the Klan may march again, in which event the circumstances attending its permit request in this case would likely recur, we hold that the case continues to present a live controversy. On the merits, we affirm the district court's judgment granting the injunction.

I

The Klan attempted an earlier march, on September 2, 1990, along the route later taken pursuant to the district court's order. The September march met considerable resistance. Counter-demonstrators near the Monument spilled into an intersection and the Metropolitan Police Department (MPD) chose not to clear it. Instead, the MPD sent the Klan by bus directly from a parking lot at the Pentagon to the Capitol, where Klan members made speeches. (The MPD claims the Klan agreed to the change voluntarily; the Klan says it was threatened with revocation of its permit if it did not agree.) Believing that it had been denied its right to march, through a combination of mob and government action, the Klan resolved to try again.

On September 17, 1990, the Klan applied for new parade permits. In order to march from the Washington Monument at 14th Street, N.W., to the Capitol along Constitution Avenue, a group must obtain permits from three authorities: the United States Park Police (which has authority over the Monument, the Mall, and the streets running through it); the MPD (which has authority over Constitution Avenue from 14th

Street to 3d Street); and the Capitol Police (which has authority over Constitution Avenue from 3d Street to the Capitol, and over the Capitol grounds). *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 751 F.Supp. 212, 219 (D.D.C.1990).

The Klan initially requested permits for October 14. The District objected on the basis of competing events. The Klan then sought October 28, a Sunday, from 12:30 p.m. to 4:30 p.m. The Park and Capitol Police representatives granted permits for that date. The MPD, on October 19, granted a permit to march only from 7th Street to 3d Street. 751 F.Supp. at 221. To keep the peace along even this reduced route, the District planned to mobilize fully the MPD. About half the city's officers were to be assigned to the march. The MPD's idea was to have officers standing shoulder to shoulder along the four block route for which it had granted the permit.

On October 23, the Klan brought an action for an injunction requiring the District to allow it to march from 14th to 3d Streets, the route the Klan requested. In the alternative, the Klan sought an order requiring the Park Police to grant a permit for a march down Madison Drive, an essentially parallel route through the Mall under Park Police jurisdiction. 751 F.Supp. at 219. The District opposed the suit on the grounds that it could not ensure the safety of the Klan's marchers or of bystanders, and could not protect property for all eleven blocks under its jurisdiction. *Id.* at 213. The United States disagreed with that assessment and urged the court to order the District to grant the permit. The federal government also contended that since the Madison Drive route would be harder to secure than the Constitution Avenue route, the Park Police should not be required to issue such a permit if the court did not enjoin the District. *Id.* at 214. On October 25, District Judge Oberdorfer granted the injunction against the District of Columbia. *Id.* at 216.

The first appeal to this court immediately followed. On October 27, by a split decision rendered without the benefit of oral argument, an emergency panel, including the writer, vacated the injunction and remanded the case. *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 919 F.2d 148 (D.C.Cir.1990). Judge Edwards thought that the record demonstrated neither a likelihood of success on the merits nor an irreparable injury, primarily because the district court had made no findings about the probability of violence or the police's ability to contain it. *Id.* at 149 (Edwards, J., concurring). The writer thought that, in the absence of any evidence that the District government harbored an improper motive for shortening the route, the District's action should be viewed as a legitimate time, place or manner restraint. *Id.* at 152 (Randolph, J., concurring). Then–Chief Judge Wald dissented, arguing that if the District could restrict the length of the march from eleven blocks to four, further reductions were also possible, and "the parade [could be] over before it beg[an]." *Id.* at 153 (Wald, C.J., dissenting).

On remand, Judge Oberdorfer sat late into the evening of October 27, holding a three and one-half hour evidentiary hearing primarily focused on the ability of the various police forces to control any possible violence, and on the District's past practices in adjusting march routes. 751 F.Supp. at 218–19. Though one MPD officer maintained that the police would not be able adequately to control violence if the march began at 14th rather than 7th Street, officers of the United States Park Police disagreed with that assessment, and thought any threatened violence controllable even over the longer route. The United States also represented that it would provide the District with all the assistance reasonably necessary—in the view of the United States—to reinforce the MPD. The court found as facts that (among other things) there was "a truly real, substantial likelihood of violence," but that "[t]he threat of violence [was] not beyond reasonable control." 751 F.Supp. at 217. It also found that while "the threat of violence in this case is not materially distinguishable from other cases," *id.* at 223, the District had acted differently in this instance.

The court therefore concluded that the Klan was likely to prevail on two theories: that the restriction was impermissible even as a time, place and manner restriction; and that the District's decision "deprive[d] plaintiffs of equal protection of the laws" because it was "not based on any discernible standard." *Id.* The court further concluded that the Klan was likely to succeed because its asserted message—that it had the right to march the full route—could only be conveyed if it got to march the full route. *Id.* At 1:00 a.m. on October 28, the court re-issued its injunction, requiring the District to allow the march to proceed from 14th Street. *Id.* at 217. The District did not seek an emergency appeal and the march went off as planned later that Saturday afternoon. According to press accounts, approximately 3,500 police officers, 1,000 counter-demonstrators, and 27 Klan members showed up. Bricks were thrown, nightsticks were swung. When it was over, six counter-demonstrators and eight police officers suffered injuries. Though the Chief of Police initially reported that one officer's neck had been broken, that injury—the most serious reported in the press—turned out to be a muscle strain. Approximately two months after the march, the District filed this appeal.

### II

■ The obvious initial question is whether the appeal is now moot. The march is over. Nothing a court could do today would change what occurred. The Klan received the full measure of relief it sought through its complaint. The complaint itself concerned only the Klan's permit requests for an October 28, 1990, parade. No regulations were challenged on their face. The United States makes several of these points in urging a dismissal for mootness. *University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981), supports its position. An appeal from an order granting a preliminary injunction becomes moot when, because of the defendant's compliance or some other change in circumstances, nothing remains to be enjoined through a permanent injunction. *See also*

*National Kidney Patients Ass'n v. Sullivan,* 902 F.2d 51, 54 (D.C.Cir.1990). That much, at least, follows from the general rule that whenever the parties "lack a legally cognizable interest in the outcome," federal courts lack power to decide the case. *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam) (citations & internal quotations omitted).

■ Still, the Klan and the District want to bring the merits of the case to an appellate conclusion. They cite the rule regarding issues "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *see also Guardian Moving & Storage Co. v. ICC,* 952 F.2d 1428, 1432 (D.C.Cir.1992). The rule, now firmly established, rescues otherwise moot cases from dismissal, *see Lewis v. Continental Bank Corp.,* 494 U.S. 472, 481–82, 110 S.Ct. 1249, 1255–56, 108 L.Ed.2d 400 (1990). Its theoretical justification is somewhat obscure. One prominent authority thinks the rule "suggest[s] a kind of justiciability by necessity," P. BATOR, D. MELTZER, P. MISHKIN & D. SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 208 (3d ed. 1988). The "evading review" aspect of the formulation does seem to be directed toward that end. But the "capable of repetition" portion appears to have a different aim—namely, assuring that the parties have a sufficient interest in the result. At any rate, we think the rule saves this appeal.

As to the "evading review" requirement, the issue here surely qualifies. By this the Supreme Court has meant evading Supreme Court review. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 547, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976). District of Columbia law requires the District to respond to any permit request made as little as 15 days ahead of time. 24 D.C.M.R. 706.2. The prospect of a violent response, which raises the issue in this case, may not fully materialize until shortly before the date scheduled for the march. Judicial review needs more time. The trial court proceedings in this case extended

over six days and ended only twelve hours before the march was to begin. The Supreme Court has noticed that trial and appellate proceedings routinely take more than twelve months to complete. *National Socialist Party v. Skokie*, 432 U.S. 43, 44, 97 S.Ct. 2205, 2206, 53 L.Ed.2d 96 (1977) (per curiam); *Sosna v. Iowa*, 419 U.S. 393, 398–99, 95 S.Ct. 553, 556–57, 42 L.Ed.2d 532 (1975); *see also Maryland People's Counsel v. FERC*, 761 F.2d 768, 773 (D.C.Cir.1985). The merits of the issue before us cannot be expected to receive "considered, plenary review" even in this court, much less the Supreme Court, prior to events overtaking the litigation. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 547, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976).

The issue also is "capable of repetition." While this aspect of the rule had been thought to have "independent significance apart from the possible repetition of injury to the particular plaintiff," Note, *The Mootness Doctrine in the Supreme Court*, 88 Harv.L.Rev. 373, 386 (1974), especially in light of *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712–13, 35 L.Ed.2d 147 (1973); *see also Honig v. Doe*, 484 U.S. 305, 335, 108 S.Ct. 592, 610–11, 98 L.Ed.2d 686 (1988) (Scalia, J., dissenting), further developments along that line have not materialized. We thus place no weight on the District's prediction that it will again receive requests for parade permits from organizations likely to provoke violent reactions, or on the evidence in the record that the District has been confronted with such situations at least four times in the past five years. By "capable of repetition" the Supreme Court now means "a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975) (per curiam); *Murphy v. Hunt*, 455 U.S. at 482; *Honig v. Doe*, 484 U.S. at 318–19, 108 S.Ct. at 601–02; *Lewis v. Continental Bank Corp.*, 494 U.S. at 481, 110 S.Ct. at 1255. In actions for injunctions,

the "complaining party" is the plaintiff and it is the likelihood of the plaintiff's encountering a similar problem in the future that matters. *See,* in addition to the cases just cited, *Washington v. Harper*, 494 U.S. 210, 218–19, 110 S.Ct. 1028, 1034–35, 108 L.Ed.2d 178 (1990). Our focus therefore must be on the Klan, not other organizations seeking permits from the city.

We believe there is a "reasonable likelihood," *Honig v. Doe*, 484 U.S. at 318, 108 S.Ct. at 601, that the Klan will again seek a permit to march in the District. Its leader avers that it regularly conducts "street walks" on major thoroughfares throughout the country and that "hardly a week goes by in which we do not conduct a street walk in some community." Declaration of Virgil L. Griffin at 2, ¶ 4 (Oct. 21, 1990)[1]. Prior to the 1990 marches it had last come to Washington in 1982. That visit, too, led to violence. We do not know today whether the Klan has any current plans to return to Washington. When the case was litigated there was no reason for the Klan to put on evidence relating to this subject. The Klan's brief states that it "may have no *current* plans for another street walk in this jurisdiction" (Brief at 14). In finding a likelihood of repetition sufficient to save a case from becoming moot on appeal, the Supreme Court has sometimes relied on counsel's statements at oral argument about his client's future plans. *Meyer v. Grant*, 486 U.S. 414, 418–19 n. 2, 108 S.Ct. 1886, 1890–91, 100 L.Ed.2d 425 (1988); *cf. Honig v. Doe*, 484 U.S. at 318, 108 S.Ct. at 601–02; *id.* at 337, 108 S.Ct. at 612 (Scalia, J., dissenting). When this case was argued on appeal, however, the court did not ask the Klan's attorney about the Klan's future intentions. But we do not think this gap in information precludes a prediction. There was no indication that the union in *Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), was actually planning another strike when federal legislation resolving the labor dis-

---

**1.** Mr. Griffin is the Klan's "Imperial Wizard." *Id.* at 1, ¶ 1; *see also* Errata Order of Dec. 12,

1990 (Civ. No. 90–2615–LFO).

pute superseded the anti-strike injunction then on appeal. The change in economic conditions that overtook the litigation in *Reeves, Inc. v. Stake*, 447 U.S. 429, 434 n. 5, 100 S.Ct. 2271, 2276, 65 L.Ed.2d 244 (1980), and ended the challenged practice, was not within the complaining party's control, and the opinion does not indicate whether Reeves had plans to continue dealing with the state's plant. But in both cases the Court found the issue capable of repetition, in *Burlington Northern* because labor disputes followed by strikes are commonplace, in *Reeves* because an economic turnabout could cause the issue to arise again, as it had three times in three decades. Washington, D.C., is a perennial favorite for demonstrations. The Klan is resolved to continue marching. We are confident that eventually it will make its way into the city again and we are just as confident that the potential of violence will attend its "street walk."

We recognize that without any prospect of an *immediate* repeat performance, the case seems out of kilter with the Supreme Court's recent decision in *Lujan v. Defenders of Wildlife*, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), concerning Article III standing. The Court there placed great weight on the fact that the alleged harms, even as plaintiffs described

them, were not predicted to occur at any identifiable point in the near future. *Id.* —— U.S. at ——, 112 S.Ct. at 2138. While we would not jump out of our chairs in surprise were the Court to say that "capable of repetition" means imminent repetition, to date it has not so much as hinted at such a limitation, and has instead considered it sufficient if the events were capable of repetition "at any time." *Washington v. Harper*, 494 U.S. at 219, 110 S.Ct. at 1035; *see also Reeves, Inc.*, 447 U.S. at 434 n. 5, 100 S.Ct. at 2276 n. 5.

The issue here is therefore "capable of repetition, yet evading review" and the appeal will not be dismissed as moot.[2]

### III

All concerned agree on several essential points. The first is that the street in question—Constitution Avenue—is a "public forum" within the accepted legal meaning of the terms. *See, e.g., United States v. Grace*, 461 U.S. 171, 177–79, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983); *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939) (Roberts, J.). Brief for Appellants at 23–24. The second is that the Klan's expressive activity here, however characterized,[3] is political in nature and cannot be relegated to any "outer

---

**2.** *Camenisch* said that the issue presented by a pre-compliance appeal from a preliminary injunction is whether the injunction is proper. 451 U.S. at 392, 101 S.Ct. at 1832. Among other factors, that depends on whether plaintiff is *likely* to succeed on the merits, and whether irreparable harm *will* otherwise occur. The Court held that after compliance, when the events giving rise to the controversy have drawn to a close, the issue is different. *Id.* at 393, 101 S.Ct. at 1832–33. Probability of success no longer matters. At that stage the question to be answered is whether the plaintiff should in fact prevail on the merits. In *Camenisch* the answer would have determined whether the student or the University had to pay for certain services already provided to the student pursuant to the lower court's order. The Supreme Court ruled that this had to be determined by the district court after a full trial. *Id.* at 398, 101 S.Ct. at 1835. Accordingly, although the action was live, the appeal from the preliminary injunction was moot. The Court therefore remanded the case for a trial on the merits.

There would be no point to that here. There is no distinct post-compliance issue. Even if we

remanded for a determination about whether the Klan *had* a legal right to march (as opposed to a *reasonable likelihood* that it did), an adverse determination could not change what occurred. We therefore will treat Judge Oberdorfer's October 28th order as the equivalent of a permanent injunction. Our statutory jurisdiction over this appeal thus results from 28 U.S.C. § 1291, not 28 U.S.C. § 1292(a)(1). *Cf.* Fed.R.Civ.P. 65(a)(2).

**3.** The District states that the Klan's "basic message" is "hatred of blacks and other groups." Brief for Appellants at 23. The Klan rejects that characterization, Brief for Appellants [Klan] at 19 n. 3, and states that it "advocates views on various political and social issues," such as church-state separation, drug use, abortion policy, and "race-mixing." *Id.* at 2–3. Neither the District nor the United States contends that the Klan was not seeking to engage in expression, *cf. Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam), and so we proceed on the basis that it was.

perimeter[ ] of the First Amendment," *Barnes v. Glen Theatres, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991). The third is that the members of the Klan were not expected to engage in violence or disorder while they made their way down Constitution Avenue.

None of this leads, however, to the conclusion that the Klan had a constitutional right to be free of all restraints. In the District of Columbia and elsewhere, those seeking to use the streets must obtain a permit. The proposition that the government may, consistent with the First Amendment, so regulate a marcher's use of the streets had at one time rested on a perceived difference between pure speech and speech plus conduct. *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (*Cox I*). More recent public forum decisions stress practicalities. One is the need to accommodate "[c]onflicting demands on the same place," which "may compel the State to make choices among potential users and uses" (*Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 98, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972)). Another is the adverse collateral effects of the speech and assembly on those who are not interested onlookers (*Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949)), whether that group consists of a "captive audience," such as the neighborhood residents in *Ward* and *Kovacs,* or visitors who could freely leave the public forum and its vicinity (*Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). Yet another, perhaps, is "the State['s] ... legitimate interest in ... protect[ing] public order." *Mosley,* 408 U.S. at 98, 92 S.Ct. at 2291–92.

■ When it comes to use of a public forum such as a street, then, speakers do not have a constitutional right to convey their message whenever, wherever and however they please. It may be that the streets have been traditionally used for communicating ideas, *Hague v. CIO,* 307 U.S. at 515, 59 S.Ct. at 963–64 (Roberts, J.), but there are interests other than the freedom of speech at stake, and government regulation is necessary. *See generally Gregory v. Chicago,* 394 U.S. 111, 117–19, 89 S.Ct. 946, 949–50, 22 L.Ed.2d 134 (1969) (Black, J., concurring); *Henderson v. Lujan,* 964 F.2d 1179, 1184 (D.C.Cir.1992). The permissible mode of regulation is summarized under the familiar heading "time, place and manner."

■ There is no doubt that the District's proposed limitation on the Klan's activities amounted quite literally to a "place" restriction. *See Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986). MPD did not propose to ban the march. It simply granted the permit with respect to some portions of Constitution Avenue on which the Klan wished to march, but not others. However, the government may not impose even a place restriction on a speaker's use of a public forum on the basis of what the speaker will say, unless there is a "compelling interest" for doing so, and the restriction "is '*necessary* to serve the asserted [compelling] interest.'" *R.A.V. v. City of St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2549, 120 L.Ed.2d 305 (1992), *quoting Burson v. Freeman,* —— U.S. ——, ——, 112 S.Ct. 1846, 1852, 119 L.Ed.2d 5 (1992) (plurality) (insertion and emphasis in *R.A.V.*); *see also id.* —— at ——, 112 S.Ct. at 1859 (Kennedy, J., concurring); *Simon & Schuster v. New York Crime Victims Bd.,* —— U.S. ——, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991); *Widmar v. Vincent,* 454 U.S. 263, 270, 102 S.Ct. 269, 274–75, 70 L.Ed.2d 440 (1981).[4]

It is therefore critical to determine whether the District's place restriction, limiting the Klan to four blocks rather than eleven, amounted to a content-based regulation. "The principal inquiry in determining content neutrality," the Supreme Court said in *Ward v. Rock Against Racism,* 491

---

**4.** The validity of even a content-neutral time, place or manner restriction will also depend on the extent to which the speaker has been given an effective alternative outlet for expression (*United States v. Grace,* 461 U.S. at 177, 103 S.Ct. at 1706–07).

U.S. at 791, 109 S.Ct. at 2753–54, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys," to which the Court added that the "government's purpose is the controlling consideration." If one took the quoted passages at face value, as the writer earlier did, *Christian Knights,* 919 F.2d at 152, the District would have a strong argument. The record contains no direct evidence that MPD acted as a result of its own views of the Klan's message, and the district court made no finding to this effect. From all that appears, the MPD acted out of a genuine concern for the safety of those in the vicinity of the march. It adjusted the route to ensure that it would be able effectively to control the outbreak of violence it anticipated.

■ But in cases other than *Ward,* the Court has focused the inquiry into content neutrality rather differently. It has asked if the time, place or manner restriction was *"justified* without reference to the content of the regulated speech," *Boos v. Barry,* 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988), *quoting Renton,* 475 U.S. at 48, 106 S.Ct. at 929, *in turn quoting Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976), or if the government interest underlying the restriction is "unrelated to the suppression of free expression," *Barnes,* —— U.S. at ——, 111 S.Ct. at 2461, *quoting United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 378–79, 20 L.Ed.2d 672 (1968), which is much the same thing. *Barnes,* 111 S.Ct. at 2460; *see also Clark v. Community for Creative Non-Violence,* 468 U.S. at 298 & n. 8., 104 S.Ct. at 3071 & n. 8. These decisions suggest that whether a restriction is content-based turns on the government interest underlying the restriction and that, although lack of government disagreement with the message is a necessary condition for content neutrality, it is not in all cases a sufficient one.

In *Boos v. Barry,* the challenged statute forbade any display within 500 feet of an embassy that called into contempt a foreign government. 485 U.S. at 316, 108 S.Ct. at 1161. The District argued that because the determination was made not by reference to its opinion of the speech in question, but rather the opinion of foreign governments, the statute was content neutral. *Id.* at 319, 108 S.Ct. at 1162. It asserted that the interest furthered by the law was the United States' vindication of its obligations under the Law of Nations, an interest the District viewed as unrelated to the content of the speech in question. *Id.* at 320, 108 S.Ct. at 1163. The Court disagreed. It pointed out that content neutral regulations are those aimed at *"secondary* effects of speech," *id.,* and made clear that "[l]isteners' reactions to speech are not the type of 'secondary effects' " it had in mind. *Id.* at 321, 108 S.Ct. at 1163–64. One Justice has since explained this analysis as a distinction between effects that have a "correlation" with a category of speech, and effects for which the content of the speech itself was "the cause of the correlation." *Barnes,* —— U.S. at ——, 111 S.Ct. at 2471 (Souter, J., concurring); *see also R.A.V.,* —— at ——, 112 S.Ct. at 2546.

■ All doubts about the issue have, in any event, now been settled. In *Forsyth County v. Nationalist Movement,* —— U.S. ——, ——, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992), the Court held flatly that "[l]isteners' reaction to speech is not a content neutral basis for regulation." The Court was there speaking of an ordinance allowing "the county ... to base parade fees on hostile crowds." *Id.* —— U.S. at ——, 112 S.Ct. at 2404 n. 12. But we can see no reason why the Court's unqualified statement should be taken to mean something different in the context of this case. The government's interest in constraining a march in light of an anticipated violent response turns on what individuals would be marching, what point they would be trying to make, and how much antagonism, discord and strife this would generate. Violence is a form of listener reaction—indeed the very form of reaction at issue in *Forsyth County*—and Judge Oberdorfer found that "[t]he District would not have

limited the permit but for [the] threat of violence." 751 F.Supp. at 221.[5] Far from contesting this finding, the District has asserted prevention of violence as its interest throughout this litigation. Brief for Appellants at 25–26. We know that the desire to protect listeners from offense or other emotional harm is not a content neutral interest. *Simon & Schuster v. New York Crime Victims Bd.,* —— U.S. ——, 112 S.Ct. at 509; *United States v. Eichman,* 496 U.S. 310, 317–18 (1990); *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 2544–45, 105 L.Ed.2d 342 (1989); *Cohen v. California,* 403 U.S. 15, 22–23, 91 S.Ct. 1780, 1786–87, 29 L.Ed.2d 284 (1971). If the citizens of the District of Columbia had petitioned their government to shorten the march to reduce the offense it would cause them, and if the District had complied, that restriction would have been analyzed as content based. The risk of one faction using government to silence another, and so stifling debate to the detriment of society at large, is not reduced when some of those citizens decide to make their wishes known with bricks instead of ballots. When government responds to wishes violently expressed, the *level* of constitutional scrutiny is no lower than when it responds to ones peacefully expressed.[6] *See* J. ELY, DEMOCRACY AND DISTRUST 111 & n. 16 (1980); Stone, *Content Regulation and the First Amendment,* 25 WM. & MARY L.REV. 189, 214–16 (1983). *Cf. Cooper v. Aaron,* 358 U.S. 1, 13, 16, 78 S.Ct. 1401, 1407, 1408–09, 3 L.Ed.2d 5 (1958).

◼ We hold that the District's proposed restriction of the location of the Klan's march, resting as it did on the threat of listeners' violent reaction to the message being delivered, was content based.

**5.** MPD Deputy Chief Carroll, the highest-ranking MPD officer to testify, did so as follows:
Q: Is the reason that these demonstrators are unable to have a march ... because they espouse unpopular views which requires that deployment for security?
A: That's correct.
Transcript of Fact Finding Hearing on Remand at 90 (Oct. 27, 1990).

## IV

Having identified the basis of the restriction, and the consequent standard of review, we are still left with the question whether the First Amendment forbids authorities, under any circumstances, to place any preconditions on a public demonstration because of the prospect of a violent response. The United States adopts essentially one of the positions of the district judge (suggested by Judge Edwards as an essential fact to be determined, *see* 919 F.2d at 151), that the threatened violence must be "truly real and substantial and *beyond* reasonable control." Brief for the United States at 37. It hastens to add that courts should accord substantial deference to the judgments of law enforcement officials concerning each material element of that standard. *Id.* at 36 & n. 34. Another view is that "the fear of the hostile audience is never to be considered in ruling upon permit applications...." Blasi, *Prior Restraints on Demonstrations,* 68 MICH. L.REV. 1481, 1515 (1970). The Klan echoes this position, arguing that the authorities may impose restrictions only on the scene in response to a clear and present danger of violence.

◼ We cannot agree that a threat of violence "is an impermissible ground even for a time, place and manner limitation." 751 F.Supp. at 223. When the choice is between an abbreviated march or a bloodbath, government must have some leeway to make adjustments necessary for the protection of participants, innocent onlookers, and others in the vicinity. The area of this march is frequented by thousands of tourists. *Clark v. Community for Creative Non–Violence,* 468 U.S. at 290, 104 S.Ct. at 1817. Government has a duty to protect them. It may be that the full route the Klan requested "is a traditional segment of

**6.** This is not to deny that a threat of violence presents different consequences than a risk of offense, nor to imply that mob violence is not an interest that government may legitimately take into account. *See infra* p. 374. The discussion thus far is concerned only with the degree of scrutiny implicated by the government's interest, not the weightiness of that interest when properly invoked.

the nation's premiere public forum," 751 F.Supp. at 221, and that the Klan's asserted "message" somehow could be conveyed only by marching the full route. *Id.* at 223. Regardless of the Klan's message, and its opinion of the precise route needed to express it, some governmental interests are weighty enough to justify restrictions on speech in a public forum—particularly restrictions, like this one, that limit but do not ban or punish a march, and indeed allow use of a significant segment of the street requested. While allowing restrictions for these reasons might tempt authorities to regulate on a pretense, the level of scrutiny established will sufficiently "detect ... whether the *asserted* justification ... in fact" underlies the restriction imposed. *Burson v. Freeman*, 112 S.Ct. at 1859 (Kennedy, J., concurring) (emphasis added); *R.A.V.*, 112 S.Ct. at 2550 & n. 8; *see also Burson*, 112 S.Ct. at 1850–51 & n. 3 (plurality).

◼ Judge Oberdorfer found that the threat of violence was real and substantial, 751 F.Supp. at 222. No party to the proceedings below seriously contended that some sort of violent response was unlikely. The focus of the dispute was the police's ability to control the violence. On that subject there was conflict not only between the testimony put on by the District and that put on by the Klan, but also between an MPD officer and senior officers of the Park Police. The trial judge recognized that he should accord some deference to the expert opinions of law enforcement professionals, but found himself facing a clash of experts. He determined that equal deference was due the officers of each department, and that "the differences between them must be resolved based upon the normal judicial criteria of demeanor, credibility, and consistency." *Id.* at 221. Based on the testimony of the various officers, evaluated thus, Judge Oberdorfer found that the threat of violence was not beyond reasonable control. *Id.* at 222.

7. Captain Harrison was scheduled to be in command of MPD forces on the day of the march.

On this record, the court's conclusion must be sustained. Major Holmberg, Commander of the Special Forces Branch of the Park Police, testified that though all agencies expected the greatest confrontation to occur at the "assembly point" of the march, "the currently planned force levels at the assembly point are believed to be sufficient to overcome unlawful attempts to stop the march by violence and to assure reasonable ... safety for persons and property." Transcript of Fact Finding Hearing on Remand at 6–7 (Oct. 27, 1990). The Major further testified that "currently planned force levels also appear to be sufficient to assure a reasonable level of safety for persons and property along the march route itself." *Id.* at 7; *see also id.* at 48. The substance of that testimony was confirmed by the Assistant Commander of the Special Forces Branch of the Park Police, Captain Irwin. *Id.* at 26, 77.

By contrast, the only testimony offered by the District about the ability of the police to control threatened violence came from MPD Inspector Collins. The Inspector testified that there was a potential for violence. *Id.* at 57. He also stated, in a closed conference, that he felt police would not be able to control the violence if the march went the full route. Transcript of Hearing (Proceedings Held at the Bench and in the Jury Room) at 12 (Oct. 27, 1990) ("Closed Proceedings"). Most of his testimony, however, came in response to hypotheticals posed to him about the September 2d march, and was rather equivocal. He concluded that "it's hypothetical and I just can't respond to that," and that he did not have an opinion on the matter. *Id.* at 72–75, 76. Inspector Collins was in charge of Intelligence; he was not responsible for determining whether the march should proceed, nor for planning or implementing security measures at the event. *Id.* at 52–53; Closed Proceedings at 14–15. The MPD officials responsible for making those decisions and implementing security measures were Deputy Chief Carroll of the Special Operations Division, and Captain Harrison, Commander of the Special Events Branch.[7]

*Id.* at 84.

**376**

Neither ever testified that the violence would be beyond reasonable control. In fact, neither witness offered any testimony about the likelihood of violence, or about the ability of the police to control any threatened violence. The district judge, who observed all the testimony, found Collins "not as convincing" as Major Holmberg of the Park Police. 751 F.Supp. at 221, ¶ 3. In light of the court's credibility determinations, and in view of the evidence just recited, we cannot disagree with the court's conclusion: that the threat of violence was not beyond reasonable control.

The potential for violence was the only reason urged upon Judge Oberdorfer, or significantly reflected by the record, as justification for limiting the march. In light of our conclusion upholding the finding that any violence would be controllable, no interest sufficiently compelling to justify limitation of the Klan's rights is supported on this record.[8] Accordingly, the order issuing a preliminary injunction to permit the march, treated by this court as a permanent injunction, is

*Affirmed.*

8. Because we affirm on this ground, we express no opinion on the district court's findings or conclusions about the District's treatment of the Klan's application as compared to its treatment of previous applications.