W.M. Jonathan **GRIDER** and Lesa P. Watson, Plaintiffs,

v.

Jerry E. **ABRAMSON**, et al., Defendants.

No. CIV. A. 3:96–CV–257–(H).

United States District Court,
W.D. Kentucky.

Jan. 27, 1998.

Samuel Manley, Louisville, KY, for Plaintiffs.

David Lindsay Leightty, Mitchell L. Perry, Paul V. Guagliardo, Lynne A. Fleming, Louisville, KY, for Defendants.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This action arises out of police procedures used during the Ku Klux Klan grievance rally and the opposition's Unity Rally held on April 13, 1996. Plaintiffs are two members of the public who wanted to attend the rallies and possibly make their own speeches. Plaintiffs claim through 42 U.S.C. § 1983 that authorities violated their First Amendment rights of free speech and association by various unnecessary and overly restrictive crowd control methods. Defendants counter that the methods were constitutionally permissible even under the strictest scrutiny. Both parties moved for summary judgment and agree that there are no genuine issues of material fact remaining in this case.[1] The Court concludes that the crowd control methods did not impermissibly restrict Plaintiffs' constitutional rights and, thus, sustains Defendant's motion for summary judgment.

### I.

The Ku Klux Klan scheduled a "grievance rally" in downtown Louisville, Kentucky on the Jefferson County Courthouse steps for Saturday, April 13, 1996. No permit was required, but the Klan notified city officials in early March of their plans. Upon learning of the Klan's plans, an opposition group obtained a permit to hold a Unity Rally on the same day in Jefferson Park which is across the street from the courthouse. The rallies were scheduled for the same time frames. The police predicted that between 20 to 50 people would attend the Klan rally.[2] How many would attend the Unity rally was uncertain. Given the obvious conflicting mes-

---

1. On April 12, 1996, Plaintiff requested an injunction and a temporary restraining order. Finding real potential for violence and determining the plan to be narrowly tailored to serve the compelling state interest in order, safety and First Amendment rights, Judge Charles R. Simpson III denied the request for injunctive relief. It appears that Defendants may have altered some of their plans in response to concerns which Judge Simpson expressed.

2. Plaintiffs state that only 25–35 Klan members were expected with an unknown amount of other spectators.

sages of the two groups, police suspected the possibility of violence and developed a Public Safety Plan.

Lieutenant Colonel Cynthia Shain testified at the injunction hearing that she initially believed ordinary security measures would be sufficient to control the crowds. However, she soon reconsidered this view. In the weeks leading up to the rallies, the police learned that several groups with a propensity for violence might attend the rallies. Among these groups were the Anti Racist Action group and National Women's Rights Organizing Coalition. Coalition members' modus operandi is 'casing' the rally site sometime before the scheduled day, and then secreting weapons into the site before the rally begins. Indeed, the day before the rally a protective sweep uncovered broken bricks and rods which were not there the previous day. Unity Rally organizers identified the ARA as being radical and confrontational anti-Klan demonstrators. The ARA circulated a flyer entitled "Run the Klan out of town" in southern Indiana high schools. The flyer urged others to "help run the racists out of town by counter-demonstrations. Show up at 11:30 a.m., bring signs, noisemakers, and your own bad self."[3]

An anonymous informer provided the police with a flyer sponsored by the Nationalist Socialist White People's Party and told the police that "we, the black citizens, need to be protected from the threat of harm." Likewise, Klan organizers feared for their own safety, and wanted special transportation to the site. The Grand Klaliff of the Ku Klux Klan told Lt. Col. Shain to expect violence, but assured her that the threat was from the audience and not speakers.

Even more disturbing were reports that a gang called the Victory Park Players was requiring new inductees to commit a crime at the rallies. According to the intelligence report, the crime of highest esteem is killing a police officer. Moreover, there had been a racially charged incident involving the police a few months earlier, and authorities suspected that this might increase the tension between the two groups.

In addition to all this local information, the police were educated by the experiences of other cities. Police from Indianapolis showed local police a videotape of a violent Klan rally in Indianapolis. In fact, due to that rally the Indianapolis police implemented certain procedures to be used during Klan rallies. Louisville police also contacted other host cities, and they all recommended similar courses of action, such as busing Klan members to the rally site, using magnetometers, separating the two rallies, keeping the crowds apart and keeping Klan rally attendees away from Klan speakers, showing a strong police presence, and not allowing anything that could be used as a weapon into the rally areas. Louisville police adopted all these measures in one form or another.

No one disputes that the specific procedures used by the police in April 1996 were extensive. Summarizing them would take several pages. Fortunately, Plaintiffs do not object to all of them, so the Court need only describe the relevant ones. The primary mechanism for keeping the peace was separating the Klan rally and the Unity rally. To do this the police established a "restricted area" covering several blocks which was made up of an inner and an outer perimeter. The rally sites constituted the inner perimeter and the outer perimeter was a type of protective zone around the inner perimeter.

No automobiles were allowed into the inner perimeter, and pedestrians wanting to attend the rallies had to pass through a magnetometer which detected prohibited weapons like knives and guns. Attendees to the rallies were also not allowed to carry "sticks, flag or banner poles, bottles, nuts or bolts, rolled coins, rocks, bricks, cans and any other item that if thrown, could cause injury." Otherwise, no one would be denied entry to either rally. People going to the rallies could carry banners and signs, so long as they were not attached to a stick or pole.

---

**3.** Defendants cite this flyer as support for their claim that violence was a probability at the rallies. The Court is not fully convinced that the flyer demonstrates a call to violence. The flyer invites attendees to bring signs and noisemakers for their counter demonstration. Certainly these are not items ordinarily associated with lawless activity. Perhaps the "own bad self" is a little intimidating, but really may not be more than an attempt to get the students' interest.

The police used jersey fencing to keep the rallies separate. Defendants explain that the "jersey fencing" is more like bike rack fencing. The fencing was four feet tall with separated vertical slats, so attendees of one rally could hear and see what was happening at the other rally. In order to route attendees towards either rally without having too much contact with the participants of the other rally, police designed a kind of maze of fencing around the sites which forced a person to choose the rally he wanted to attend and then guided him toward that rally. If that person wanted to attend the other rally, he/she would have to leave the "restricted area" altogether, come back to the general entrance and once again go through the magnetometer. There was no direct route between the two rallies.

Finally, the segregation was further bolstered by the sheer numbers of police patrolling the area. Authorities had 600 police on call if an incident arose. Ironically, it rained and the rain must have had the double effect of keeping people away and cooling the tempers of those present. There were no incidents of violence.

Conduct during the rallies was also somewhat circumscribed. Apparently, only scheduled speakers were allowed to make a speech in the restricted area. Plaintiffs assert in their motion that "[n]o one would be permitted to make a public speech on any subject in the restricted area unless, presumably, he or she were either a Klan speaker or an Opposition Rally speaker." Plaintiffs suggest at a different point in their motion that "[n]o one would be permitted to make a public speech except as permitted by authorities.... Specifically, one could not preach the Gospel on the sidewalk in front of Citizens Plaza." One Plaintiff claims that he saw people being escorted from the rallies because they attempted to speak publicly. Defendants offer no specific rebuttal to Plaintiffs' contentions. The Court notes that the only named Plaintiffs are Grider and Watson, neither of whom were made to leave the rally for attempting to make a speech. No one who was escorted

from the rallies has filed a suit, and no one was arrested during the rallies. However, Plaintiff Grider complains that he did not make a speech at the rallies because he had been informed during the preliminary hearing that speech making was generally prohibited; Plaintiff Watson claims that she did not attend the rallies because she knew that she would not be allowed to speak.[4]

Another intrusion by the police into the Klan rally was a police enforced buffer zone between Klan speakers and the attendees. As Plaintiffs explain, attendees were not allowed to comingle with the Klan speakers. From the pictures provided by Plaintiff, the Court concludes that Klan audience members were forced to stand across the street from Klan speakers. So the street served as the buffer zone. No such buffer zone separated attendees and speakers at the Unity Rally.

## II.

The Court may quickly deal with Plaintiffs' first contention that the whole system is per se unconstitutional because there was no ordinance guiding police procedures. All the cases cited by Plaintiffs are those where permits to hold rallies or parades were denied by administrators without reference to any guidelines for making that determination. Denying the permit effectively prohibited speech.

█ Plaintiffs do not claim that they were denied a permit to hold a rally at either site, and here the procedures implemented insured at least some freedom of speech. The police had a duty to protect the KKK and Unity speakers from hostile audiences. "A police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take reasonable action to protect from violence persons exercising their constitutional rights." *Glasson v. City of Louisville*, 518 F.2d 899, 906 (6th Cir. 1975).

Whether the measures were reasonable or not is yet to be seen, but there is certainly no

4. Defendants do not contest Plaintiffs' standing, nor do they assert that this action is moot. The Court notes that the question is capable of repetition without review. *See Pinette v. Capitol Square Review and Advisory Bd.*, 30 F.3d 675 (6th Cir.1994).

argument that the police were without authority to develop safety procedures. Plaintiffs must realize that the police had less than a month to prepare for the rallies and that it is impossible to require legislation for every possible problem that might develop in that short amount of time.

## III.

Plaintiffs' other arguments are closer questions evolving inevitably from the various police procedures implemented. Plaintiffs object to the crowd control methods which included keeping the rallies separated, setting up a magnetometer and enforcing a buffer zone between KKK rally attendees and speakers. Plaintiffs most strongly object to the restriction on public speeches by people attending the rallies. In its simplest form the question is the same as always: did the authorities go too far and encroach on citizens' First Amendment rights.

## A.

■ To resolve these issues, the Court must have an analytic framework. Several factors can affect the approach taken, including the type of forum and the type of restriction imposed. Plaintiffs and Defendants believe that the courthouse steps and the park are public forums which have traditionally been used by citizens to exercise their freedom of speech. The Court agrees. "Public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.' In such places, the government's ability to permissibly restrict expressive conduct is very limited." *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).

■ Speech in a public forum is subject to reasonable time, place and manner restrictions. There are generally two types of re-

strictions: content-neutral and content-based. A content-neutral regulation is one that can be justified without reference to what is being expressed, whereas a content-based regulation is actually triggered by the speaker's message. A content-neutral regulation must be narrowly tailored to serve a significant state interest. A content-based regulation of speech in a public forum must be necessary and narrowly tailored to serve a compelling state interest. The restrictions should leave open ample alternate channels of communication. *See Perry Educ. Assn. v. Perry Local Educators Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). A basic precept of free speech is that the worst thing a government can do is regulate speech based on its content, which explains the more exacting constitutional standard of a 'compelling state interest.' Plaintiffs and Defendants contend that all the procedures are content-based. The Court is not so sure.[5]

■ The parties are correct that any procedures implemented because of the effect the speech might have on a listener is content-based. The Supreme Court has held that "[l]isteners' reaction to speech is not a content-neutral basis for regulation. (citations omitted) Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134–35, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Clearly, separating the rallies, installing a magnetometer, and enforcing the buffer zone[6] are content-based regulations which arguably burden the speech of the rally organizers and audience members. These procedures were implemented because the police were afraid the speakers' message would incite violence. Therefore, the Court must determine whether the measures were narrowly tailored procedures necessary to serve a compelling state interest. *See Perry,* 460 U.S. at 45.

---

5. The Court agrees that the procedures analyzed in Section III(A) of this Memorandum, the fencing, the magnetometer and buffer zones, are content-based. In Section III(B), the Court concludes that the ban on speeches may be content-neutral.

6. The Court does not believe that the fencing, magnetometer and buffer zone are exactly restrictions on freedom of speech, but Defendants do not object to this characterization. Therefore, for the purposes of this opinion, the Court will view these procedures as restrictions on the freedom of speech or association, since the applicable standard is compelling state interest.

Defendants identify safety as that compelling state interest. Authorities were afraid of violence and the Court finds their fears justified. Under the circumstances, they did not, as suggested by Plaintiffs, over-react to the situation. Hindsight is 20/20. Had the police known that it would rain and only a few people would attend the rallies they might have concluded that such stringent procedures were unnecessary. But the police did not know this. What they did know was that two highly controversial and emotionally charged rallies were scheduled across the street from each other on the same day. They knew that potentially violent groups might make a showing at the rallies; they knew that a local gang's initiation required a crime be committed at the rallies; that a racially charged incident involving the police had occurred recently; that in other cities where competing KKK and opposition rallies were held violence tended to break out and that these cities recommended certain procedures. The threat of violence, especially in a situation where the violence might suppress speech, is certainly a compelling state interest warranting some action.

Despite the possibility of violence, officials did not prevent either rally from using its choice of forum or its selected time-slot. Changing the time or place of either rally would have reduced the threat of violence but also would have been more restrictive and inconsistent with the goal of fostering public debate. Instead, authorities simply put up fencing to keep the rallies separate, but within view and hearing of each other. By keeping the rallies separate, the police lessened the threat of violence. By allowing the rallies to take place across the street from each other, the police encouraged the very robust debate the First Amendment is designed to protect and encourage. Certainly, a debate is more vigorous when the opponent is within range, but a genuine debate is less likely when participants are afraid for their safety.

"[S]ome governmental interests are weighty enough to justify restrictions on speech in a public forum—particularly restrictions, like this one, that limit but do not ban or punish . . . ." *Christian Knights of the Ku Klux Klan Invisible Empire v. District of Columbia*, 972 F.2d 365 (D.C.Cir.1992). The state's overriding interest was public safety, which, in turn, was essential to the exercise of everyone's First Amendment rights. Thus, keeping the rallies separate serve equally the state's interest of public safety and of free unimpeded speech. Organizers chose their own forum and attendees could travel between the rallies with the moderate inconvenience of going through the magnetometer again. The rallies were separated by low fencing where people in both crowds were aware of the opposing message being delivered. The separation was one of the least restrictive means possible for protecting the participants and seems directly related to the state's interest in controlling mob violence. There is no evidence suggesting that the separation was for the unrelated and nefarious purpose of chilling speech. In fact, the separation would probably encourage the debate, rather than inhibit it.

Likewise, the magnetometer and buffer zone were procedures narrowly tailored to further the government interest of public safety. The Second Circuit has held that the magnetometer is a perfectly reasonable means for checking weapons at such rallies. That court addressed the issue in terms of the Fourth Amendment's prohibition against unreasonable searches and seizures while noting that free speech was only incidental to the Fourth Amendment issue. *See Wilkinson v. Forst*, 832 F.2d 1330 (2d Cir.1987). It identified the key factor as the "perceived danger of violence, based upon the recent history at such locations, if firearms were brought into them." *Id.* at 1339 (analogizing to airport and courthouse magnetometer cases).

This Court agrees that the magnetometer is a permissible tool in cases like this where violence is a real possibility. Both the Grand Klaliff of the Klan and a black citizen asked police for protection. Authorities had ample reason to fear the presence of weapons at these rallies. Indeed, police found rods and bricks during the protective sweep which they concluded may have been planted to be used as weapons. The police were not at liberty to do nothing; authorities had to de-

velop some way of allowing the rallies to proceed while at the same time protecting those participating.

But the question remains whether all these procedures taken as a whole were necessary to further the state's interest in safety. That is, were some of the restrictions overreaching and redundant? Clearly, the magnetometer serves a purpose that is not achieved with other procedures. It eliminates the threat of particular weapons. Also, the fencing between the two factions reduces the real risk of violence between the "hostile" crowds. A final question deserves an answer. Once the risk of violence is minimized through the protective sweep and magnetometer, angry crowds being separated, and a showing of substantial police force, was the buffer zone really necessary to further the state's interest? The buffer zone does not actually impair protected speech. Its unique purpose was to protect Klan speakers from attack. Klan speakers did not oppose the buffer zone. In fact, the Grand Klaliff requested protection and warned that audience members were the danger. There was obviously some fear that Klan speakers' words might cause someone from the crowd to attack them. The grievance message against minorities, homosexuals and women suggests that this was a well-founded fear.

One may fairly ask, does not complete absence of trouble at the rallies suggest that Defendants way overreacted. Not if the violence threatened was severe. A low probability that a serious threat would become reality can justify stringent police action. *Compare Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia,* 972 F.2d 365, 376 (D.C.Cir.1992) (Under facts very different from ours, the court considered a city's decision to limit a parade route in terms of the potential for violence and the ability of the police to control any threatened violence. The appellate court affirmed the injunction against restrictions on a march because neither side produced evidence of uncontrollable violence.) That the rallies were peaceful may indicate

that the procedures deterred the violence which would have erupted without the procedures. It was certainly reasonable for police to believe that the fencing, buffer zone and magnetometer were necessary to further the city's interest in public safety.[7]

### B.

■ The ban on speeches made by audience members requires a different analysis. Both parties believe that the ban is content-based, and therefore requires the same strict scrutiny as the other measures. However, the Court is not so persuaded. The Court finds that the absolute prohibition on speech by anyone other than organized speakers is not content-based, but content-neutral. The police were not at all concerned with what the attendees would say. According to Lieutenant Colonel Shain, the procedures permitted organizers, regardless of their message, to speak and did not allow non-designated speakers to make any speech, regardless of their message. To be sure, restrictions imposed because of listener's reactions are content-based. However, neither side has explained how prohibiting all speech is covered by the listener's reaction rule. If authorities had said only Klan supporters can speak during that rally even if they are not scheduled to speak, then perhaps this would be content-based. The ban on speech can be justified without reference to the content of the regulated speech, which was not the case with the fencing, buffer zone and magnetometer. *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Plaintiffs' speech was regulated without regard to what they would say. Therefore, the Court concludes that a total ban on all speech made by attendees is a content-neutral, not content-based, regulation.

Notwithstanding that the regulation was content neutral, the suppression of all other speech raises concern because any prior-restraint on speech is suspect. *See Forsyth*

---

7. The Court is not giving authorities free reign to use these same procedures in every Klan rally that comes to Louisville. A Klan rally or Unity rally, without more, may not be a sufficient threat to public safety. The Court is only deciding that in this case, where the potential violence was substantial, these measures were appropriate.

*County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). However, one does not have the right to make a speech at anytime and at any place. When there is a sufficient state interest, the government can impose restrictions. A reasonable time, place and manner restriction is constitutional if it is content-neutral, there is a significant state interest, and the procedures are narrowly tailored to further the state interest. *See Clark,* 468 U.S. at 293. The restriction must allow for alternate channels of communication. *See Perry,* 460 U.S. at 45.

Plaintiffs are angry because they could not enter the restricted area and make their own speech. This prohibition did not only apply to them. Shain testified that no one, including a street corner evangelist, would be allowed to make a public speech. Presumably, only organized speakers of each rally were allowed to enter the restricted area and make an actual speech. The Court is asked to balance the rights of some citizens against the rights of others. Both groups are guaranteed the right to make public speeches in traditional public forum with only minimal interference from the government. However, the question is complicated when citizens wish to "preach from the same pulpit." Or in this case, from the same cathedral.

The basic gist of Plaintiffs' claim seems to be that they had a constitutional right to interfere with these two rallies because they occurred in public forums. The United States Supreme Court has acknowledged the state's interest in regulating the competing uses of a public forum, but it has not specifically addressed the issue here, which is whether a person has the right to make a speech during someone else's rally. *See Forsyth,* 505 U.S. at 130.

Several lower courts have addressed this issue and concluded that a person has an "undeniable right to express his views, whatever they [are], but not in an area set aside for another event where his intrusion would be an interference." *Sanders v. United States,* 518 F.Supp. 728, 730 (D.D.C.1981). For instance, in *Sanders* the court held that plaintiff could not hold signs in the middle of another group's public exhibit. The plaintiff wanted to hold signs next to Christmas trees lit up for the 'pageant of peace.' The court noted that the pageant had a prior right to the forum because the permit had not expired and because the exhibit was there first and still going on when plaintiff interfered. The court then noted two significant state interests. First, the state had an interest in preventing the confusion and disorder that could result from everyone intruding upon the exhibit. Second, the state should guarantee citizens the "right to participate in events or demonstrations of their own choosing without being subjected to interference by other citizens." *Id.* The court defined interference as any intrusion into another's event for the purpose of "interjecting one's own convictions or beliefs ... regardless of how insubstantial or insignificant it might appear." *Id.*

In a case somewhat analogous to our own, another district court held that anti-Bush/Quayle demonstrators could not demonstrate at the same rally as pro-Bush/Quayle demonstrators. *Schwitzgebel v. City of Strongsville,* 898 F.Supp. 1208 (N.D.Oh.1995). The court found the restriction to be a reasonable time, place and manner restriction. The public forum was reserved for the Republican rally and the authorities had a duty to prevent a "multitude of individuals with different messages from expressing their views simultaneously, resulting in a cacophony where no one's message is heard." *Id.* at 1217.

■ The message of these two cases resonates with this Court's firm belief that no one had a constitutional right to interfere with the established Klan and Unity rallies. The rally organizers had a prior claim to the sites. Plaintiffs were not denied a rally permit, nor did they notify authorities before the Klan that they intended to hold a rally on the courthouse steps. Therefore, the Klan and Unity rally organizers speech was paramount on April 13, 1996, and anyone wanting to make a public speech at the reserved sites would be an interference.

The government certainly has a significant interest in keeping peace and order during public rallies. Moreover, it has a significant, even compelling, interest in allowing citizens to exercise their freedom of speech without

disruption. Plaintiffs may make the argument that one, lone preacher would not be a disruption, but this Court must consider the cumulative effect of everyone who might want to make a speech in the restricted area. *See Clark v. Community for Creative Non-Violence,* 468 U.S. at 297. Even Plaintiffs should be able to imagine the chaos of everyone with a bone to pick making a speech in the restricted area. The ban on public speeches was certainly required to further the government's interest. Furthermore, the ban on speech is narrowly drawn; it is not unrelated to the state's interest in public order and protecting free speech. Had authorities decided to quash speech based on its message, then, arguably, the restriction would not be narrowly drawn because the suppression would be somewhat unrelated to the state's interest of curbing disruption.

### C.

Finally, there were ample channels of communication left open. Attendee's could not travel directly from one rally to another, but they could go to the other rally just by going back through Armory Place. Plaintiffs could take in signs, and Shain even testified that a person wearing the KKK 'uniform' of white hood and robes could go into the Unity rally's area. Although audience members could not make a public speech in the reserved sites, they were certainly free to express themselves in other ways. Plaintiffs could have reserved another downtown site for their own rally, or gone to a sidewalk outside the restricted area to make any speech they were unexpectedly inspired to make. Or, the Court assumes that after the rallies were over and the danger had subsided, Plaintiffs could have made a speech from the courthouse steps on that very day.

When the KKK reserved the courthouse steps and asked police for protection and the Unity rally got its permit, the police were obligated to protect their First Amendment rights. The police had a duty to " 'maintain order by taking such steps as may be reasonably necessary and feasible to protect peaceable, orderly speakers, marchers or demonstrators in the exercise of their rights against violent or disorderly retaliation or attack at the hands of those who may disagree and object.' " *Glasson,* 518 F.2d at 907 (quoting *Cottonreader v. Johnson,* 252 F.Supp. 492, 497 (M.D.Ala.1966)). Plaintiffs had no constitutional right to talk over or shout down the rally speakers. Allowing individuals to drown out the message of lawful speakers would diminish, rather than affirm, the right of free speech.

As it was, Louisville citizens were able to partake of an event quintessentially American. Two violently opposed groups protested one another without violence. Can one imagine a better venue than one where the message is heard by the enemy, and the speaker need not fear physical retaliation? How much better and securely could officials have affirmed our nation's profound commitment to the principle that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Perhaps Defendants' efforts at crowd control, which may have actually enhanced the freedom to speak, should be celebrated and not censored.

### IV.

Plaintiffs also argue unconvincingly that Defendants' actions violated the Commerce Clause and ask for declaratory and injunctive relief. Assuming this could be a viable cause of action, any procedures which in some way affected commerce were necessary to protect the state's interest in public safety. Furthermore, these limited impairments to public travel were necessary to accommodate the parties' rights to freedom of speech. Therefore, Plaintiffs commerce clause claim also fails.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Plaintiff and Defendant have moved for summary judgment. After thoroughly reviewing the memoranda and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment is SUSTAINED and Plaintiffs' complaint is DISMISSED WITH PREJUDICE.

This is a final and appealable order.