# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 20, 2025          Decided April 28, 2026

No. 25-1104

EVERGREEN SHIPPING AGENCY (AMERICA) CORP. AND
EVERGREEN LINE JOINT SERVICE AGREEMENT,
PETITIONERS

v.

FEDERAL MARITIME COMMISSION AND UNITED STATES OF
AMERICA,
RESPONDENTS

———

On Petition for Review of an Order on Remand
of the Federal Maritime Commission

———

*Robert K. Magovern* argued the cause for petitioners. With him on the briefs were *Matthew Howell* and *Rachel Schwartz*.

*Michael B. Kimberly* was on the brief for *amicus curiae* the National Association of Waterfront Employers in support of petitioners.

*Paul W. Hughes*, *Andrew A. Lyons-Berg*, and *Grace Wallack* were on the brief for *amicus curiae* in support of petitioners.

2

*Phillip "Chris" Hughey*, General Counsel, Federal Maritime Commission, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, and *Stephanie E. Rice*, Attorney-Advisor, Federal Maritime Commission. *Harry J. Summers*, Attorney, Federal Maritime Commission, entered an appearance.

Before: CHILDS, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves a petition for review filed by Evergreen Shipping Agency (America) Corporation and Evergreen Line Joint Service Agreement (collectively, "Evergreen"), a common carrier, challenging an order issued by the Federal Maritime Commission ("FMC" or "Commission") pursuant to its authority under the Shipping Act of 1984 ("Act"). The matter arises out of a dispute between TCW, Inc. ("TCW"), a trucking company, and Evergreen over "detention charges" that Evergreen levied on TCW for the late return of borrowed equipment. As we explain below, the dispute between TCW and Evergreen has consumed the affected parties for six years. FMC has heard the matter twice, and this is the second petition for review before this court. We now review the Order on Remand that was issued by the Commission following this court's decision in *Evergreen Shipping Agency (America) Corp. v. Federal Maritime Commission*, 106 F.4th 1113 (D.C. Cir. 2024) (*Evergreen I*).

This saga began in 2020 when Evergreen and Yamaha

Motor Company, Ltd. ("Yamaha") entered into an agreement to transport goods from Japan to Newnan, Georgia. Evergreen was responsible for the ocean transportation of the goods from Japan to the Port of Savannah, Georgia. Yamaha designated TCW as its "Preferred Trucker" to complete the landside portion of the transportation between the Port of Savannah and Yamaha's plant in Newnan. Evergreen allowed TCW to use Evergreen's container and chassis for a limited time to facilitate transport of the goods to the Yamaha plant. TCW had 21 days of free time for Evergreen's container and 4 days of free time for its chassis; thereafter, detention charges of $150 and $20 would accrue for the container and the chassis, respectively, every calendar day, including weekends and holidays. TCW picked up the shipment, including the container and chassis, from the port on April 28, 2020. Due to a COVID-related closure at the Yamaha plant in Newnan, TCW did not return the chassis and container to the port until May 26, which was 7 days late for the container and 22 days late for the chassis. Evergreen invoiced TCW $1,490 in detention charges. TCW objected to the $510 charged for May 23-25, when TCW was unable to return the equipment because the Port of Savannah was closed. Evergreen refused to waive the charges. TCW paid and then filed a complaint with the Commission against Evergreen. TCW argued the $510 charge was unjust and unreasonable because it could not have returned the borrowed equipment when the port was closed.

In its initial review of this matter, FMC found merit in TCW's plea for relief from the disputed detention charges. It found that there was "nothing [TCW] could have done to return the container [during the port closure] because the port was not receiving empty containers." *TCW, Inc. v. Evergreen Shipping Agency (Am.) Corp.*, 2022 WL 18068977, at *5 (Dec. 29, 2022). As a result, FMC found that the disputed detention

charges could not serve their goal of incentivizing faster equipment return.

Evergreen filed a petition for review with this court. On July 5, 2024, we granted the petition, vacated the Commission's Initial Order as to the reasonableness determination, and remanded the matter to the agency for further proceedings. *Evergreen I*, 106 F.4th at 1118. The court ordered the Commission to more carefully "analyze the incentive effect of the detention charges at issue" and "respond reasonably to Evergreen's arguments" justifying the charge on grounds other than the incentive principle. *Id*. at 1114.

On February 13, 2025, the Commission issued an Order on Remand holding that Evergreen's contested detention charges were unreasonable. *TCW, Inc. v. Evergreen Shipping Agency (Am.) Corp*., 2025 WL 516256 (Feb. 13, 2025). FMC acknowledged that charging detention during a port closure generally incentivizes faster equipment return. The Commission explained, however, that it was necessary to consider more than just whether a fee incentivized the fastest possible return. Instead, the most important inquiry was whether a fee enhanced "freight fluidity." *Id*. at *4-6. Given the Port of Savannah's three-day closure and TCW's inability to retrieve the equipment from Yamaha any earlier, FMC concluded that the disputed detention charges could not promote freight fluidity. FMC also determined that none of the alleged extenuating circumstances identified by Evergreen justified charging TCW for the late delivery attributable to the port closure.

Evergreen now petitions for review again. Its principal argument is that the Commission lacked substantial evidence for its findings. "An agency action is arbitrary and capricious

if it rests upon a factual premise that is unsupported by substantial evidence." *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992). It also contends that "the Commission misapplied [46 C.F.R. § 545.5 (2020) (the 'Interpretive Rule')] by abandoning the 'incentive principle' and replacing it with a new 'freight fluidity principle,' with no support for any such test in the Interpretive Rule." Pet'r's Br. 19. We disagree and, for the reasons explained below, deny the petition for review.

Contrary to Evergreen's arguments, FMC's Order on Remand is reasonable and supported by substantial evidence in the record. Indeed, Evergreen has conceded the three crucial facts supporting FMC's Order in this case: (1) TCW could not retrieve the equipment from Yamaha any earlier than it did because of Yamaha's plant closure; (2) the port's gates were not open to deliveries during the three-day closure; and (3) Evergreen suffered no costs as a result of the delayed equipment return. These uncontested facts gave the Commission adequate grounds to decide that charging detention during the port closure would not have promoted freight fluidity and thus was unreasonable. Evergreen had the opportunity to contest each point, but it never submitted rebuttal evidence below or even requested discovery.

Furthermore, FMC's Order on Remand is entirely consistent with the Commission's Interpretive Rule. The rule plainly focuses on the extent to which detention charges are "serving their intended primary purposes as financial incentives *to promote freight fluidity*." 46 C.F.R. § 545.5(c)(1) (emphasis added). Therefore, because we find no merit in Evergreen's claims, we deny the petition for review.

## I. Background

### A. *The Shipping Act and the Interpretive Rule*

Under the Shipping Act of 1984, "[a] common carrier . . . may not fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property." 46 U.S.C. § 41102(c). FMC enforces and interprets § 41102(c)'s reasonableness requirement.

In 2020, after a lengthy fact-finding investigation precipitated by widespread industry discontent over carrier fees, FMC promulgated an "Interpretation of [§ 41102(c)]" as to "Unjust and Unreasonable Practices with Respect to Demurrage and Detention." 46 C.F.R. § 545.5 (capitalization altered). The Interpretive Rule explains "how the Commission will interpret [§] 41102(c) . . . in the context of demurrage and detention" fees. *Id.* § 545.5(a).

The Interpretive Rule first defines demurrage and detention. It explains that these terms "encompass any charges, including 'per diem,' assessed by ocean common carriers . . . related to the use of . . . shipping containers." *Id.* § 545.5(b). "Detention" is a penalty for delays in equipment return. "Demurrage" is a penalty for delays in equipment pickup. This case concerns detention.

Under the Interpretive Rule, FMC applies an "incentive principle" to evaluate the reasonableness of challenged detention and demurrage fees. As noted above, the incentive principle requires that FMC "consider the extent to which demurrage and detention are serving their intended primary purposes as financial incentives to promote freight fluidity." *Id.*

§ 545.5(c)(1). To illustrate how this works in practice, the Interpretive Rule outlines the "[p]articular application[] of [the] incentive principle" to common scenarios, including "[e]mpty container return." *Id.* § 545.5(c)(2). "Absent extenuating circumstances," the Interpretive Rule explains, "imposition of detention when it does not serve its incentivizing purposes, such as when empty containers cannot be returned, [is] likely to be found unreasonable." *Id.* § 545.5(c)(2)(ii).

FMC released guidance with the Interpretive Rule. *See* Interpretive Rule on Demurrage and Detention Under the Shipping Act, 85 Fed. Reg. 29638 (May 18, 2020). While detention is a "valid charge[] when [it] work[s]," FMC said, "when [it] do[es] not, there is cause to question [its] reasonableness." *Id.* at 29651. FMC previewed that, in reasonableness challenges, it would focus on "the extent to which . . . detention [is] serving [its] intended purpose[] as [a] financial incentive[] to promote freight fluidity." *Id.* And FMC would "continue[] to understand . . . detention as primarily being [a] financial incentive[] to promote freight fluidity," although it allowed that detention "might have other purposes," like compensation. *Id.* at 29652. Given its focus on freight fluidity, FMC explained that it intended the Interpretive Rule to reflect a "general principle[]" that "truckers should not be penalized by . . . detention practices when circumstances are such that they cannot retrieve containers from, or return containers to, marine terminals because under those circumstances the charges cannot serve their incentive function." *Id.* at 29638. Nonetheless, FMC committed to "consider[ing] all arguments raised in [each] individual case" as it conducts "case-by-case adjudication." *Id.* at 29647.

A party that alleges a violation of the reasonableness

requirement can file an administrative complaint with FMC. *See* 46 U.S.C. § 41301(a). Disputes involving amounts under $50,000 may be resolved through an informal small claims process. *See* 46 C.F.R. § 502.301(b).

**B.** *TCW's Delayed Equipment Return*

As highlighted in the introduction to this opinion, Yamaha contracted with Evergreen to transport a shipment from Japan to the Port of Savannah. For ground transportation from the port to Yamaha's plant in Georgia, Yamaha hired TCW. Under a tripartite agreement between Yamaha, Evergreen, and TCW, Evergreen gave TCW 21 days of "free time" for the shipping container and 4 days of "free time" for the chassis to facilitate TCW's transportation of the shipment to the plant. If TCW failed to return the container and chassis by the end of the "free time," it agreed to pay Evergreen $150 per day for the container and $20 per day for the chassis.

Yamaha's shipment was delivered to the Port of Savannah on April 28, 2020, and TCW collected it that day. "Free time" on the container ended on May 19, 2020, and "free time" on the chassis ended on May 4, 2020. However, TCW did not return Evergreen's equipment on time. Yamaha's Georgia plant was closed due to the pandemic, and TCW heard from Yamaha on May 21, 2020 that the container and chassis would only be available for pickup on May 23, 2020. TCW retrieved the equipment on May 23. But from May 23-25, the Port of Savannah was subject to planned closures – on Saturday, May 23, due to "reduced business as a result of the COVID-19 pandemic," on Sunday, May 24, as regularly scheduled, and on Monday, May 25, for Memorial Day. Joint Appendix ("J.A.") 505-06. TCW returned the container and chassis on May 26 when the port reopened. The container was 7 days late, and the

chassis 22 days.

Evergreen invoiced TCW for $1,490 in detention charges. TCW disputed $510 in fees for May 23-25, when the port was closed. Evergreen refused to waive the charges.

### C. *Procedural History*

TCW filed a complaint. It argued that charging detention during the port closure was unreasonable because TCW was unable to return the equipment. In its sworn complaint, TCW said that it had "made all attempts to . . . ensure cargo and equipment . . . moved as fluidly as possible, while dealing with the [Yamaha] plant shut-down during the Covid19 crisis." J.A. 161. "In no way," TCW insisted, "could [it] have returned the equipment sooner." *Id.*

The Commission's Small Claims Officer ("SCO") agreed with TCW, finding that the detention charges for May 23-25 "were unreasonable because they could not have incentivized cargo movement given that the port was closed on those days, making it impossible for [TCW] to return the equipment." J.A. 521-22. FMC *sua sponte* reviewed the SCO's decision. It affirmed because "no amount of detention can incentivize the return of a container when the terminal cannot accept the container." *TCW*, 2022 WL 18068977, at *5. Here, FMC said, "there was nothing [TCW] could have done to return the container between May 23-25, 2020 because the port was not receiving empty containers." *Id.*

Evergreen appealed. In *Evergreen I*, we vacated and remanded the case to the Commission for two reasons. *See* 106 F.4th at 1114. First, FMC failed to address four facts that Evergreen argued justified the disputed charges. Without an

"expla[nation] [of] why [these facts] either were not relevant . . . or were outweighed by countervailing considerations," we explained, FMC did not "mak[e] [the] circumstantial, fact-bound inquiry" it was required to. *Id.* at 1117-18. Instead, it impermissibly "treated the incentive principle as [a] sort of 'bright line' rule." *Id.* at 1117. Second, we found the logic of FMC's application of the incentive principle "implausible." *Id.* at 1118. FMC had concluded that "a detention charge necessarily lacks any incentivizing effect [when] levied for a day on which a container cannot be returned to a marine terminal." *Id.* "On the contrary," we reasoned, "being charged for detention during a port closing announced before the carrier picks up the equipment heightens the incentive to return equipment on time." *Id.*

On remand, FMC "assess[ed] reasonableness by balancing how a particular charge fits within the incentive principle to further the primary purpose of promoting freight fluidity alongside other arguments and extenuating circumstances raised by the parties to determine if they are relevant to assessing reasonableness and if so, whether they outweigh the finding under the incentive principle." *TCW*, 2025 WL 516256, at *4.

FMC began by applying the incentive principle with an emphasis on freight fluidity. Following *Evergreen I*, FMC allowed that the disputed charges created "an incentivizing effect . . . to return equipment before scheduled port closures." *Id.* at *5. However, "[i]ncentivizing equipment to be returned just before scheduled closures will not always have a positive impact on freight fluidity." *Id.* For example, FMC explained, equipment returned shortly before a closure is unlikely to be processed, and a rush to return equipment could create "congestion and logjams at ports." *Id.* FMC also predicted that

the availability of detention during port closures could reduce incentives for carriers and terminal operators to "be creative or innovative about how they could promote freight fluidity." *Id.* at \*6. FMC credited the SCO's factual findings, including that Yamaha's plant was closed for COVID-19 and that TCW made "all efforts" to move the equipment quickly. *Id.* at \*7. On these facts, FMC concluded, "no amount of detention charges over the port's scheduled closures could have incentivized [TCW] to return the equipment before the closures because [TCW] could not collect the equipment any earlier." *Id.* So the disputed fees could not have enhanced freight fluidity and were thus unreasonable "absent 'extenuating circumstances' or other 'factors, arguments, and evidence' that can establish reasonableness." *Id.* (citation omitted).

FMC then responded to each of the "extenuating circumstances" Evergreen alleged justified the charges. *First*, FMC found that the "generous" free time that Evergreen gave to TCW was relevant to the reasonableness determination, but "not dispositive." *Id.* at \*8. Here, "though the free time provided was generous," and it was generally reasonable for Evergreen to levy detention after free time expired, the allotted free time was not a rationale for detention charges on the specific days during which the port was closed. *Id. Second*, FMC explained that the charges were not reasonable simply because they were part of a contractual agreement. It emphasized that carriers "do not have an unbounded right to contract for whatever they want," and "there is reason to question whether . . . detention practices are normally the subject of arms-length negotiation between parties with remotely equal bargaining power." *Id.* (citation omitted). *Third*, while relevant, TCW's "awareness of the [port] closures d[id] not make [Evergreen's] detention charges reasonable because [TCW] was unable to act on this knowledge" due to

Yamaha's COVID-related plant closure. *Id.* at \*9. And *fourth*, FMC acknowledged that TCW was already past its free time when the port closures occurred. *Id.* But the burden was on Evergreen to "produc[e] evidence regarding the compensatory aspects of . . . detention" which would justify applying the "once on [detention], always on [detention]" principle. *Id.* at \*9-10 (emphasis removed) (citations omitted). Evergreen had no such evidence, so, on the facts of this case, FMC could not find the disputed charges reasonable as compensation instead of incentive. Having undergone a "careful review of the facts and circumstances," FMC concluded that "none of the additional justifications or extenuating circumstances, alone or collectively, establish the reasonableness of [Evergreen's] detention charges." *Id.* at \*11.

Evergreen now petitions for review of the Order on Remand, again on arbitrary and capricious grounds. We have jurisdiction over the petition under 28 U.S.C. § 2342(3)(B), which provides that courts of appeals have jurisdiction to review "all rules, regulations, or final orders of . . . [FMC] issued pursuant to [listed statutes]."

## II. ANALYSIS

### A. *Standard of Review*

Our review in an arbitrary and capricious challenge is "deferential." *Evergreen I*, 106 F.4th at 1117. "[A]gency action is arbitrary and capricious if the agency has: 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

We are "required to set aside agency findings that are unsupported by 'substantial evidence.'" *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994) (citation omitted). This is a "'narrow standard of review' requiring only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citation omitted). "An agency conclusion 'may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view.'" *Id.* (citation omitted). And "in their application to the requirement of factual support, the substantial evidence test and the arbitrary and capricious test are one and the same." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (cleaned up).

## B. *FMC's Reasonableness Determination Was Not Arbitrary and Capricious*

FMC found it unreasonable for Evergreen to charge TCW detention fees for May 23-25. Its determination was based on factual findings supported by substantial evidence. It was also consistent with FMC's Interpretive Rule and the product of a fact-specific analysis.

### 1. There Was Substantial Evidence for FMC's Factual Findings

As noted above, FMC relied on three factual findings, all expressly conceded by Evergreen: (1) the delayed return was caused by Yamaha's plant closure, (2) the Port of Savannah was closed and could not accept deliveries on May 23-25, and (3) Evergreen incurred no costs because of the delay. Together, these three conceded facts form a reasonable basis for FMC to

determine that charging detention on May 23-25 did not serve either detention's primary goal of incentivizing efficient equipment return to enhance freight fluidity or its secondary purpose of compensating carriers for costs incurred due to delay. We thus reject Evergreen's argument that FMC lacked sufficient evidence to support its factual findings.

*First*, as Evergreen concedes, the delay in equipment return was caused by Yamaha's plant closure. During the small claims proceeding, the SCO found that TCW was "unable to timely return the equipment . . . because [Yamaha's] plant was shut down due to COVID-19." J.A. 521. When FMC decided to review the SCO's decision, it instructed Evergreen and TCW to submit additional briefing on reasonableness. *See* J.A. 530-32. Evergreen's supplemental brief stated, as "Fact No. 1":

> [TCW] failed to [return the equipment on time] for reasons having nothing to do with Evergreen[] or the [p]ort. To the contrary, . . . the reason for the failure to return the equipment was that it was stuck in [Yamaha's] facility.

J.A. 537-38. Evergreen agreed, then, that no detention charges could have compelled TCW to retrieve the equipment from Yamaha's facility before May 23, because the equipment was not available any earlier than May 23. In Evergreen's own words, the equipment was "stuck" in Yamaha's facility.

Evergreen now disputes this crucial point. It argues that FMC lacked evidence of when the equipment was available for pickup and why there was a delay. *See* Pet'r's Br. 20. It also suggests that "[n]either [FMC] nor the [SCO]" actually made the factual finding that Yamaha's plant closure affected TCW's ability to return the equipment. *Id.* at 41-43. As a result,

Evergreen says, "[FMC]'s reliance on this conclusion . . . is . . . arbitrary and capricious." *Id.* at 43. These new arguments from Evergreen are unpersuasive. The SCO credited TCW's explanation that Yamaha's plant closure caused the delayed pickup. *See* J.A. 521. When given the opportunity to challenge this finding, Evergreen agreed, in its own FMC brief, that the reason for TCW's delay was the Yamaha plant closure. *See* J.A. 537-38. Evergreen cannot now argue that FMC's reliance on this concession was arbitrary and capricious.

For the same reasons, we reject Evergreen's suggestion that TCW fell short of its burden to provide evidence Yamaha's plant closure caused the delay. Again, Evergreen stated, as fact, that "the reason for [TCW's] failure to return the equipment was that it was stuck in the [Yamaha] facility." J.A. 538. And even if Evergreen had not conceded the point, which it did, it was reasonable for FMC to rely on TCW's sworn allegation that it had "no way" to return the equipment sooner, despite "ma[king] all attempts" to do so, because it was "dealing with [Yamaha's] plant shut-down during the Covid19 crisis." J.A. 161; *see Echostar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002) (allowing the FCC to "rely upon the uncontested, sworn affidavit of a witness speaking from personal knowledge"). TCW also submitted a May 21 email from Yamaha informing it that the equipment would be available for pickup on May 23. *See* J.A. 164-70. Evergreen admits that it never tried to submit rebuttal evidence and never requested further discovery although it had the opportunity to do so. *See* Oral Argument at 3:00-6:45. Instead, Evergreen agreed, in its written submission to FMC, that "the reason for [TCW's] failure to return the equipment was that it was stuck in the [Yamaha] facility." J.A. 538. The bottom line is that Evergreen did not contest that the delay was caused by Yamaha's plant closure. FMC reasonably relied on this

conceded fact.

*Second*, there is no dispute that the Port of Savannah closed its gates on May 23-25. The parties also agree that the port would not allow new deliveries through the closed gates. So Evergreen concedes that it was physically impossible for TCW to have brought the equipment, retrieved from Yamaha's facility as soon as it was available on May 23, through the port's gates from May 23-25. The gates were closed. Even if it is true, as Evergreen claims, that some port activities continued even while the gates were closed such that the port "likely could have processed TCW's return of Evergreen's equipment prior to the closure," Pet'r's Br. 32, what was happening behind the closed gates is of no moment here because TCW simply could not go through the gates.

*Third*, Evergreen stated at oral argument that it did not incur any costs because of the delay. *See* Oral Argument at 16:48-17:40. The delay, while a violation of contract terms, did not lead to any harmful consequences for Evergreen. Evergreen argues that it is unreasonable for FMC "to hold an ocean carrier responsible for delay costs when the actual cause of delay was . . . the responsibility of another party." Pet'r's Br. 48. But as Evergreen concedes, there were no such costs here.

Evergreen straightforwardly conceded these three facts, and FMC reasonably relied on them. They provide ample support for FMC's finding that it was unreasonable for Evergreen to charge TCW detention on May 23-25. Because of Yamaha's plant closure, TCW could not retrieve Evergreen's equipment prior to May 23. But starting on May 23, the Port of Savannah's gates were closed to new deliveries, and TCW was physically unable to bring the equipment into the port. While TCW's delay violated the terms of its agreement with

Evergreen, Evergreen suffered no costs as a result of the delay. Evergreen had the opportunity to rebut this evidence or to seek discovery, and it chose not to do so. Evergreen's central contention, that FMC lacked the requisite facts to find the charges for May 23-25 unreasonable, is thus contradicted by Evergreen's own concessions and actions below. Under these circumstances, it was not arbitrary and capricious for FMC to conclude that the disputed fees did not serve either their "primary purpose[] as financial incentives to promote freight fluidity," 46 C.F.R. § 545.5(c)(1), or any secondary "compensatory aspect[]," 85 Fed. Reg. at 29652. No charges could have compelled TCW to return the equipment earlier, because TCW was first unable to access the equipment at Yamaha's plant and then physically barred from going through the port's gates to deliver the equipment. Detention fees did nothing to help the equipment move more fluidly through the system. And they also could not be justified as compensation for costs caused by the delay, because there were no such costs. The fees were thus unreasonable.

## 2. Evergreen's Additional Arguments are Unpersuasive

There is no merit to three additional arguments raised by Evergreen: (1) FMC misapplied the Interpretive Rule by considering freight fluidity; (2) FMC relied on unsupported assumptions; and (3) FMC did not engage in a fact-specific analysis. We will address each argument in turn.

*First*, as we have already noted, FMC properly considered freight fluidity in its application of the incentive principle. In the Order on Remand, FMC explained that "the goal of the incentive principle is to ensure that reasonable detention charges 'promote freight fluidity,' a concept that is broader

than simply the quickest equipment return and which requires balancing competing incentives." *TCW*, 2025 WL 516256, at *5 (citation omitted). This understanding of the incentive principle comes straight from the text of the Interpretive Rule and FMC's accompanying guidance. Under the Interpretive Rule's definition of the incentive principle, FMC must "consider the extent to which demurrage and detention are serving their intended primary purposes as financial incentives to *promote freight fluidity*." 46 C.F.R. § 545.5(c)(1) (emphasis added). The Interpretive Rule thus required FMC to ask whether late fees would enhance freight fluidity and emphasized that the "intended primary purpose" of detention is to "promote freight fluidity." *Id.* The centrality of freight fluidity is also clear in FMC's guidance, released with the Interpretive Rule, which stated that FMC "continues to understand demurrage and detention as primarily being financial incentives to promote freight fluidity." 85 Fed. Reg. at 29652. It is simply untrue that, as Evergreen asserts, FMC's focus on freight fluidity has "no support in the Interpretive Rule, or in any of the administrative or rulemaking proceedings leading up to it." Pet'r's Br. 26. To the contrary: freight fluidity has always been integral to the incentive principle, and consideration of freight fluidity was a mandate of the Interpretive Rule, not a deviation from it.

In fact, the Interpretive Rule and FMC's guidance preview that the promotion of freight fluidity can sometimes outweigh speedy return. The Interpretive Rule, in outlining "[p]articular applications of [the] incentive principle," states that "[a]bsent extenuating circumstances, practices and regulations that provide for imposition of detention when it does not serve its incentivizing purposes, *such as when empty containers cannot be returned*, are likely to be found unreasonable." 46 C.F.R. § 545.5(c)(2)(ii) (emphasis added). And in its guidance, FMC

explains how it would apply the Interpretive Rule to a nearly identical set of facts, where the port is closed and equipment is already past free time:

> If demurrage cannot act as an incentive for cargo and equipment fluidity because, for instance, a marine terminal is closed for several days due to a storm, charging demurrage in such a situation, even if a container is already in demurrage, raises questions as to whether such demurrage practices are tailored to their intended purpose in accordance with section 41102(c).

85 Fed. Reg. at 29653. Given this language, we do not agree with Evergreen's claim that "[n]ot once . . . did [FMC] ever say the general promotion of 'freight fluidity' . . . could or would under any circumstance outweigh 'simply the quickest equipment return.'" Pet'r's Br. 26. Nor is there any basis for Evergreen's suggestion that focusing on freight fluidity conflicts with the logic of the incentive principle. *See id.* at 23. As FMC explained, enhancing freight fluidity is an inherent aspect of the incentive principle. And Evergreen does not challenge the Interpretive Rule.

*Second*, FMC reasonably relied on its expertise and experience when analyzing the potential impact of requiring equipment return during port closures. Evergreen argues that FMC made three unsupported assumptions to reach its decision, namely: (1) "the port could not have processed TCW's prompt return of Evergreen's container" if it was returned on May 22; (2) "TCW's return of the equipment prior to the port closure would have caused congestion"; and (3) "charges over scheduled port closures might create 'disincentivizing effects' that could hinder freight fluidity." *Id.*

at 31, 33-34 (capitalization altered). But "[a]gencies are entitled to make assumptions about facts within their area of expertise as long as they are reasonable, which [these] [are]." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 596 (D.C. Cir. 2022). The three challenged assumptions are plainly within FMC's area of expertise. And, as FMC explains, its analysis of the future impacts of detention charges is inherently hypothetical and predictive in nature. In the absence of concrete information, it was not unreasonable for FMC to rely on its expertise. For example, its concern about congestion was based on four forums it held at "major gateway ports" with "industry stakeholders, regulators, and the general public." J.A. 9. At the forums, FMC learned that when many motor carriers wish to avoid detention charges on the same day, "there may be congestion at the terminal gates." J.A. 23. Similarly, FMC's prediction of negative incentives for port operators came from its fact-finding for the Interpretive Rule. During that process, "shippers, intermediaries, and truckers" argued that allowing detention charges when "equipment could not be retrieved or returned weakened any incentive for [carriers and ports] to address port congestion and their own operational inefficiencies." 85 Fed. Reg. at 29639. Evergreen has not shown that these assumptions, based on FMC's expertise and experience, were "certainly wrong" such that it "would be wrongheaded . . . to persist" in relying on them. *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994).

*Third*, FMC adequately responded to each "extenuating circumstance" Evergreen identifies: (1) "Evergreen's allotment of 21 days of free time for the container," (2) "that TCW contractually agreed to accept responsibility for the detention charges for all days after the expiration of free time," (3) "that TCW had months of advance notice that the Port of

Savannah was going to be closed from May 23-25," and (4) "that free time had expired two days before . . . the [p]ort was closed." Pet'r's Br. 38 (emphasis removed). FMC acknowledged that each fact was relevant to its analysis. But it explained that none could overcome the disputed charges' failure to promote freight fluidity when considered in context of the facts of the dispute.

As to the 21-day allotment of free time, FMC agreed that Evergreen was "generous" and that charging detention after the expiration of free time was generally reasonable. *TCW*, 2025 WL 516256, at *8. But the question in this case, FMC said, was whether charges "after the expiration of . . . free time [and] *during the [p]ort's closure*" were reasonable. *Id.* The length of free time offered did not justify detention during a port closure.

Next, FMC addressed TCW's contractual agreement to the disputed charges. It explained that "[o]cean carriers . . . do not have an unbounded right to contract for whatever they want." *Id.* (citation omitted). Instead, carriers like Evergreen remain subject to the reasonableness requirement even when there is a contract. FMC also observed that "most shippers . . . lack significant bargaining power as compared to ocean carriers." *Id.* (cleaned up). For these reasons, the mere fact of TCW's agreement did not make the charges reasonable.

Third, FMC agreed that TCW had advance notice of the port's closure, but it pointed out that TCW was "unable to act on [its] knowledge to return the equipment earlier when the [p]ort was open" because it could not retrieve the equipment from Yamaha's closed plant. *Id.* at *9.

And finally, FMC acknowledged that TCW was past its free time when the port closure began. But FMC refused to

adopt Evergreen's "once on [detention], always on [detention]" bright line rule. *Id.* (citation omitted). "Merely because a container is already in a state of detention," FMC explained, "does not mean that charges are reasonable . . . regardless of circumstance." *Id.* at *10. It faulted Evergreen for failing to provide evidence that detention could be reasonable as compensation for costs incurred as a result of the delay. *Id.*

Far from "formulaically dismiss[ing] each one out of hand," as Evergreen claims, Pet'r's Br. 39, FMC specifically discussed each fact and explained why it was not enough to make the detention charges reasonable. *TCW*, 2025 WL 516256, at *8-11. In sum, we reject the suggestion that the Commission failed to adequately consider the extenuating circumstances raised by Evergreen.

### III. CONCLUSION

For the reasons stated above, Evergreen's petition for review is hereby denied.

*So ordered.*